**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNSYLVANIA STATE** | : | **CIVIL ACTION NO. 1:06-CV-1079** |
| **TROOPERS ASSOCIATION and** | : | |
| **BRUCE A. EDWARDS,** | : | **(Judge Conner)** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL JEFFREY B. MILLER,** | : | |
| **individually and in his official capacity** | : | |
| **as Commissioner of the** | : | |
| **Pennsylvania State Police,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

This action seeks declaratory and injunctive relief and challenges the sick leave policy of the Pennsylvania State Police under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. Plaintiffs Pennsylvania State Troopers Association and its president, Bruce A. Edwards, (collectively "PSTA") allege that the policy violates the ADA because it requires police officers to disclose the nature of their illness when requesting sick leave. PSTA contends that the policy may result in officers divulging information about disabilities, thereby contravening the ADA's prohibition on medical inquiries. Defendant Jeffrey B. Miller ("Miller"),[1]

---

[1] Miller resigned his post as PSP commissioner after the commencement of this action. Lieutenant Colonel Frank Pawlowski currently serves as acting commissioner. See Press Release, Pennsylvania State Police, Governor Rendell Appoints Lt. Col. Frank Pawlowski as Acting State Police Commissioner (July 11, 2008), available at http://www.psp.state.pa.us/psp/cwp/view.asp?A=11&Q=177278.

who is commissioner of the Pennsylvania State Police, ("PSP"),[2] counters that the inquiry is essential to PSP's operation because it enables police supervisors to plan for adequate shift coverage and to ensure that officers are fit for duty upon return from leave.  PSTA and Miller have filed cross-motions for summary judgment (Docs. 40, 44).  For the reasons that follow, both motions will be granted in part and denied in part.

## I.   <u>Statement of Facts</u>[3]

PSTA is a labor organization that represents all officers, also known as members, of the Pennsylvania State Police except senior management.  (Doc. 41 ¶¶ 3-4; Doc. 53 ¶¶ 3-4.)  PSTA challenges a portion of PSP's sick leave policy that requires members to report the nature of their illness when using leave.  The challenged provision has been in effect since January 13, 1975 and appears in PSP Field Regulation ("FR") 1-2.11(A).  (Doc. 44-3 ¶ 17.)  FR 1-2.11(A) provides:

> Notification of Illness or Injury (Off Duty):  Members who know that they will be unable to report for duty due to illness or injury they incurred while off duty shall immediately notify their supervisor (or ensure such notification) *of the nature of the injury or illness*, where they will be recuperating, and the expected date of return to duty.

---

[2]Plaintiffs originally filed suit against both Miller and the Pennsylvania State Police.  Plaintiffs later conceded that the State Police force is immune from suits under the ADA pursuant to the Eleventh Amendment to the United States Constitution.  (<u>See</u> Doc. 31 at 4.)  The court dismissed the claims against PSP on May 1, 2007.  (<u>See</u> Doc. 32.)

[3]In light the applicable standard of review, the court will present the facts in the light most favorable to the non-moving party with respect to each motion.  <u>See</u> <u>infra</u> Part II.

Supervisors shall also be advised of any changes in the above which
may occur after the original notification was given.

(Doc. 42, Ex. A at FR 1-2.11(A) (emphasis added)).  The only component of this

regulation challenged by PSTA is the notification clause.  (See Doc. 43 at 2.)

PSTA also attacks section 4-5.07(C)(1) of PSP's Administrative Regulations

("AR"), which incorporates FR 1-2.11(A) by reference.  (Doc. 42, Ex. B at AR 4-

5.07(C)(1)).  AR 4-5.07(C)(1) requires that "[n]otification [of an officer's intent to use

sick leave] shall be made . . . in accordance with the provisions of FR 1-2."  (Id.)

Members may use sick leave for several purposes, including an illness, disability,

bereavement, routine medical or dental appointments, and illness or medical

appointments of an immediate family member.  (Id. at AR 4-5.07(B)(1)-(4)).

On May 26, 2006, PSTA commenced the instant action, the sole issue in

which is whether the notification clause of FR 1-2.11(A) violates the ADA by

requiring members to inform supervisors "of the nature of the[ir] injury or illness."

(See Doc. 1 ¶¶ 13-14 & pp. 9-10.)  Miller contends that PSP supervisors utilize the

information provided by members to arrange for shift coverage during a member's

absence and to ensure that an ill member is fit for duty upon return to work.  He

therefore asserts that the illness notification clause furthers a business necessity

and is lawful under the ADA.  PSTA alleges that the asserted business necessities

do not require implementation of a generally applicable illness notification policy

and that several unchallenged PSP regulations adequately address Miller's

3

concerns.  The parties have fully briefed these issues, which are now ripe for

disposition.

## II.   <u>Standard of Review</u>

Through summary judgment the court may dispose of those claims that do

not present a "genuine issue as to any material fact," and for which a jury trial

would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  It places

the burden on the non-moving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v.

City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e)(2);

<u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986);

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see

also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action

proceed. <u>Pappas</u>, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment

concurrently.  <u>Cf.</u> <u>Assicurazioni Generali, S.P.A. v. Pub. Serv. Mut. Ins. Co.</u>, 77 F.3d

731, 733 & n.2 (3d Cir. 1996) (observing that district court may dispose of case

through cross-motions for summary judgment); <u>see also</u> 10A CHARLES ALAN

WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).  When

doing so, the court is bound to view the evidence in the light most favorable to the

4

non-moving party with respect to each motion.  FED. R. CIV. P. 56; <u>United States v. Hall</u>, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

### III. **Discussion**

PSTA alleges that FR 1-2.11 violates § 102 of the ADA, codified at 42 U.S.C. § 12112.  Section 12112(d)(4) prohibits an employer from "requir[ing] a medical examination . . . [or] mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity."  <u>See</u> 42 U.S.C. § 12112(d)(4)(A).  To establish a prima facie case under § 12112(d)(4), the plaintiff must demonstrate that (1) the plaintiff is an employee of the defendant and (2) that the policy either requires a medical examination or requires disclosure of information regarding a disability or

that "may tend to reveal a disability."[4] <u>Conroy v. N.Y. State Dep't of Corr. Servs.</u>,

333 F.3d 88, 95 (2d Cir. 2003); <u>Green v. Joy Cone Co.</u>, 278 F. Supp. 2d 526, 538 (W.D.

Pa. 2003) (holding that a non-disabled plaintiff may challenge an employer's policy

requiring medical examinations and inquiries); <u>accord</u> <u>Fredenburg v. Contra Costa</u>

<u>County Dep't of Health Servs.</u>, 172 F.3d 1176, 1182 (9th Cir. 1999); <u>Griffin v. Steeltek,</u>

<u>Inc.</u>, 160 F.3d 591, 593-94 (10th Cir. 1998).  An employee challenging a medical

---

[4]The plain language of § 12112(d)(4)(A) prohibits medical inquiries regarding whether an "employee is an individual with a disability" or regarding "the nature or severity of the disability."  42 U.S.C. § 12112(d)(4)(A).  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities . . . [,] (B) a record of such an impairment[,] or (C) being regarded as having such an impairment."  <u>Id.</u> § 10102(2).  Miller argues that § 12112(d)(4) has no effect on FR 1-2.11(A) because the illness notification clause "does not require employee [sic] to identify whether they are individuals with a disability or provide other information about whether a condition substantially limits his or her life activities.  Rather, it seeks only of [sic] a general statement of 'the nature of the injury or illness' which prevents an employee from reporting for duty."  (Doc. 46 at 11.)  <u>Conroy v. New York State Department of Correctional Services</u>, however, holds that an employee need not possess a disability to challenge an employer's medical inquiry and that a general diagnosis reporting policy falls within the parameters of § 12112(d)(4).  333 F.3d 88, 94-95 (2d Cir. 2003); <u>see also</u> <u>infra</u> note 5 (concluding that PSP's illness reporting policy is substantially similar to the diagnosis reporting policy at issue in <u>Conroy</u>); <u>infra</u> note 8 (observing that <u>Conroy</u> is the seminal case on these issues).  Our sister court for the Western District of Pennsylvania has reached a similar conclusion, <u>see</u> <u>Green v. Joy Cone Co.</u>, 278 F. Supp. 2d 526, 538 (W.D. Pa. 2003) (concluding that an individual need not have a disability to challenge an employer's pre-employment medical examination policy), and the United States Court of Appeals for the Third Circuit has endorsed <u>Conroy</u> as recently as 2007.  <u>See</u> <u>Ward v. Merck & Co.</u>, 226 F. App'x 131, 139-41 (3d Cir. 2007) (relying on <u>Conroy</u>'s explication of the business necessity defense to uphold an employer's requirement that a particular employee submit to a single fitness for duty evaluation following a month-long absence prompted by a stress-related outburst in the employer's cafeteria).  This soundly confutes PSP's assertion.  The court concludes that, were the Third Circuit to address the applicability of § 12112(d)(4) to illness notification policies, it would adopt the holding set forth in <u>Conroy</u>.

examination policy need not demonstrate that he or she is a qualified individual with a disability, as defined in 42 U.S.C. § 12111(8).  See Conroy, 333 F.3d at 95 ("[A] plaintiff need not prove a disability in order to challenge a medical examination or inquiry."); Green, 278 F. Supp. 2d at 538 (holding that a plaintiff seeking to challenge a medical records inquiry "need not prove to the court that she is a qualified individual with a disability"); see also Fredenburg, 172 F.3d at 1182.  A policy that requires the employee to provide a general diagnosis or description of a medical condition constitutes a prohibited inquiry under § 12112(d)(4).  Conroy, 333 F.3d at 95; Green, 278 F. Supp. 2d at 530, 538, (holding that employment policy requiring job applicants to execute a release of their medical records was actionable under § 12112(d)(2) and (d)(4)).

If the employee presents a prima facie case, the employer incurs the burden of vindicating the challenged policy by demonstrating that it is "job-related and consistent with business necessity."  § 12112(d)(4)(A); see Ward v. Merck & Co., 226 F. App'x 131, 141 (3d Cir. 2007) (quoting Conroy, 333 F.3d at 98).  This requires the employer to demonstrate that the policy is related to the plaintiff's employment and "is vital to the business" of the employer.  See Ward, 226 F. App'x at 140 (quoting Conroy, 333 F.3d at 98).  Safeguarding occupational safety, curbing excessive absenteeism, and ensuring that employees are emotionally and physically fit to perform their duties illustrate the types of justifications that qualify as business necessities.  Id. at 140-41 (quoting Conroy, 333 F.3d at 98); see also Tice v. Centre Area Transp. Auth., 247 F.3d 506, 517-19 (3d Cir. 2001) (holding that a municipal

transportation authority did not violate § 12112(d) when it required an employee driver, whose medical condition interfered with his driving ability, to undergo an examination).  The challenged medical examination or inquiry must "genuinely serve[] the asserted business necessity and [must be] no broader or more intrusive than necessary" to further it.  Conroy, 333 F.3d at 98; see also Gajda v. Manhattan & Bronx Surface Transit Operating Auth., 396 F.3d 187, 188-89 (2d Cir. 2005); see also Ward, 226 F. App'x at 139 n.20 (quoting Conroy, 333 F.3d at 98) (reiterating that a fitness-for-duty inquiry requires the employer to possess legitimate concern that the employee may fail to discharge his or her employment responsibilities).  "The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal."  Conroy, 333 F.3d at 98.

Mere convenience to an employer is insufficient to support a viable business necessity defense, and a medical examination or inquiry that furthers a business necessity without playing a vital role in consummating it will transgress the ADA. See Conroy, 333 F.3d at 97 (quoting Cripe v. City of San Jose, 261 F.3d 877, 890 (9th Cir. 2001)) (observing that "[t]he business necessity standard is quite high[] and is not [to be] confused with mere expediency" (first and third alterations in original)); see also El v. Se. Pa. Transp. Auth., 479 F.3d 232, 242 (3d Cir. 2007) (reiterating that mere "business convenience" is insufficient to qualify as a business necessity). Whether the employer's asserted justification satisfies the business necessity standard under § 12112(d)(4) is a question of fact.  See Ward, 226 F. App'x at 140;

8

Schlegel v. Berks Area Reading Transp. Auth., No. Civ. A. 01-6055, 2003 WL
21652173, at *4 (E.D. Pa. Jan. 9, 2003) (denying defendants' motion for summary
judgment under § 12112(d)(4) because the viability of a business necessity defense
presented a disputed issue of fact).

### A.   PSTA's Prima Face Case

A prima facie case under § 12112(d)(4) requires the plaintiff to establish that
(1) the plaintiff is an employee of the defendant and (2) the challenged policy either
mandates a medical examination or requires disclosure of information tending to
evince a disability.  Conroy, 333 F.3d at 95.  A collective bargaining organization
possesses standing to assert a claim on behalf of its members under § 12112(d)(4).
See Transp. Workers Union of Am., Local 100 v. N.Y. City Transit Auth., 342 F.
Supp. 2d 160, 165-70 (S.D.N.Y. 2004) (holding that unions have associational
standing to advance ADA claims on behalf of the employees they represent).

PSTA has successfully carried its prima facie burden in the instant matter.
PSTA functions as the collective bargaining entity for PSP members, and
FR 1-2.11(A) requests information about "the nature of [employees'] injury or
illness." (Doc. 42, Ex. A at FR 1-2.11(a)). This inquiry has the potential "to reveal
whether the employee has a disability."  See Conroy, 333 F.3d at 95-96 ("[S]ince
general diagnoses may expose individuals with disabilities to employer stereotypes,
[a policy requiring employees to provide them] implicates the concerns expressed in

. . . the ADA.").[5]   Hence, PSP's policy is within the purview of § 12112(d)(4) and may

be challenged by PSTA.  See id. at 95 (holding that requiring an employee to

provide "a general diagnosis [of illness] is sufficient to trigger the protections of the

ADA" under § 12112(d)(4)); Transp. Workers Union of Am., Local 100 v. N.Y. City

Transit Auth., 341 F. Supp. 2d 432, 438, 447 (S.D.N.Y. 2004) (stating that

§ 12112(d)(4) applies to sick leave policies that require employees to divulge "the

nature of the illness or condition causing the absence"); Roe v. Cheyenne Mountain

Conference Resort, 920 F. Supp. 1153, 1154-55 (D. Colo. 1996) (concluding that an

employer cannot institute a drug testing program requiring disclosure of

employee's prescription medications because such disclosure could reveal a

disability), rev'd in part on other grounds, 124 F.3d 1221 (10th Cir. 1997).

---

[5]Miller asserts that Conroy does not apply to the instant case because it
addressed disclosure of medical diagnoses, which FR 1-2.11(A) does not require.
However, a comparison between the policy at issue in Conroy and FR 1-2.11(A)
reveals that they both request similar information.  In Conroy, descriptions such as
"recuperating from minor surgery" or "treated for a minor foot injury" satisfied the
general diagnosis requirement.  See Conroy, 333 F.3d at 95.  FR 1-2.11(A) similarly
mandates that members explain the reason for their absence using general
language such as "flu, back problems, stomachache[,] or cold."  (Doc. 44-3 ¶ 25.)
PSP also requires its members to disclose conditions including seizures,
psychological disorders, and ankle sprains pursuant to the policy.  (Id. ¶¶ 26, 27.)
The breadth of the Conroy inquiry is similar to FR 1-2.11(A) notwithstanding the
latter's omission of the word *diagnosis*.  See Transp. Workers Union of Am., Local
100 v. N.Y. City Transit Auth., 341 F. Supp. 2d 432, 438, 447 (S.D.N.Y. 2004)
(applying § 12112(d)(4) to a policy that mandated disclosure of the nature of an
employee's condition upon the employee's return to work after illness).
FR 1-2.11(A) is therefore within the ambit of § 12112(d)(4).

### B.     Miller's Business Necessity Defense

Miller incurs the burden of establishing that FR 1-2.11(A) is "job-related and consistent with business necessity." § 12112(d)(4)(A). He alleges that FR 1-2.11(A) furthers two business necessities. First, the policy allows police supervisors to assess the likely duration of members' absences and plan for adequate shift coverage. Second, disclosure of members' illnesses allows supervisors to evaluate whether members are fit to return to active duty after absence or whether they should be placed on restricted duty assignments. The court will address these asserted business necessities *seriatim*.

### 1.     Planning for Substitute Shift Coverage

Miller asserts that the illness notification policy enables supervisors to estimate the length of a member's absence and to arrange for adequate staff coverage. (Doc. 44-3 ¶ 23.) Without FR 1-2.11(A), supervisors would allegedly realign shift coverage at a moment's notice, potentially leaving vital patrols unmanned or requiring PSP to incur excessive overtime costs. (Id. ¶¶ 21, 23.) PSTA argues that the illness reporting clause is broader than necessary because PSP could accomplish similar goals by requiring members to provide only an estimated date of return without describing their medical condition. The court will evaluate first whether PSP's need to secure its shift coverage qualifies as a business necessity and second whether the illness notification clause is broader than necessary to serve the professed business necessity.

11

### a.   Substitute Coverage as a Business Necessity

To establish a business necessity, an employer must demonstrate that the asserted necessity is "vital" to the employer's business.  Ward, 226 F. App'x at 131. In the instant matter, PSP members handle routine patrol functions as well as unforeseen public emergencies.  Examples of such crises include the 1979 near-meltdown at the Three Mile Island nuclear generating facility, the 1989 prison uprising at the State Correctional Institution at Camp Hill, and the September 11, 2001 crash of Flight 93 in Shanksville.  Clearly, PSP must maintain adequate coverage on all shifts to manage daily law enforcement tasks and sudden exigencies.  Accordingly, the court finds that Miller's articulated scheduling justification qualifies as a business necessity, and his motion for summary judgment will be granted with respect to this issue.

### b.   Whether FR 1-2.11(A) Serves the Shift-Coverage Business Necessity

The court must also determine whether the illness reporting clause "serves [this] business necessity and . . . is no broader or more intrusive than necessary" to accomplish it.  Conroy, 333 F.3d at 97.  Miller contends that the illness reporting policy enables police supervisors to assess, at the onset of a member's illness, whether the member has underestimated the member's date of return.  It also prevents sudden staffing shortfalls and overtime costs that accrue when members return to duty early, only to discover that they require further recuperation.

According to Miller, a "supervisor's broader experience in reviewing and approving his/her subordinates' sick leave will enable him [or her] to determine when a member has made an unrealistic assessment of his [or her] date of expected return." (Doc. 44-3 ¶ 25.)  The policy therefore presumes that police supervisors, who lack medical training and who receive only a brief description of members' illnesses, can more accurately assess the severity of members' conditions than the ill members or their physicians.  The manner in which members report illnesses, however, betrays the validity of this presumption.

FR 1-2.11(A) requires a succinct statement of a member's condition.  This description need not include the severity of the ailment or the precise illness afflicting the member.  The policy does not require the member to submit the information personally, and a friend or family member may contact a supervisor on the member's behalf.  Presumably, most leave requests occur during a short telephone conversation or through an email.  This brief communication about the general nature of a member's ailment is inadequate to enable supervisors to form a reasoned judgment about the potential length of the member's illness.  The uncertainty becomes magnified by the timing of sick leave requests, which occur at the beginning of an illness, when the member may lack precise information about the ailment from which he or she suffers.  PSP supervisors cannot evaluate whether an ill member has provided a realistic return date based exclusively upon a single, short conversation with the member or the member's designate at the outset of an ailment.  Supervisors may possess considerable experience processing leave

13

requests, but this administrative background is a poor substitute for a member's—or a physician's—immediate, personal assessment of the physical limitations caused by a particular illness.  Hence, the individuals best poised to predict an accurate date of return are the ill member and his or her physician.

PSP can assess members' return to duty through means less intrusive than the illness notification clause of FR 1-2.11(A).  PSP currently requires members to submit an estimated date of return when requesting sick leave.  Members absent for three or more days must submit this information along with a doctor's certificate.  (See Doc. 42, Ex. B at AR 4-5.07(C)(5)-(6)).  PSP also requires members to update supervisors as the expected duration of their leave changes.  (See Doc. 42, Ex. A at FR 1-2.11(A)).  Requiring members to continuously update their date of return avoids disclosure of members' illnesses while providing police supervisors with a firsthand estimate of absence length performed by the individuals most closely associated with members' illnesses.  Such estimates provide supervisors with a better informed, more accurate date of return than the myopic

14

approximation that they could perform based solely upon a general description[6] of a

member's condition at the outset thereof.  Hence, the illness reporting clause of

FR 1-2.11(A) is unnecessary to PSP's staff-coverage business necessity because PSP

possesses other, less intrusive means of forecasting the date of a member's return.

### 2.        Assessing Members' Fitness for Return to Duty

Miller next contends that the illness reporting clause of FR 1-2.11(A) furthers

a business necessity because it enables supervisors to assess members' fitness for

return to duty following illness.  Members often face volatile law enforcement

encounters which require sharp faculties and decisive resolve.  Hence, supervisors

must verify that officers are physically, psychologically, and emotionally fit for these

duties upon return from sick leave.  Miller asserts that "[t]he potential exists for

members with illness such as seizures, traumatic brain injuries, [and] psychological

disorders . . . to present themselves for duty and to attempt to perform their full

duties as PSP Troopers, without the Department's knowledge that the members are

---

[6]FR 1-2.11(A) also fails to support PSP's business necessity defense because it
provides insufficient information from which supervisors can predict a date of
return to work.  The regulation mandates "only a general statement of the
injury/illness[,]" and descriptions such as "flu, back problems, stomachache, or
cold" fulfill members' reporting obligations. (Doc. 44-3 ¶ 25.)  Members need not
describe the severity of their conditions.  These general illness descriptions could
reflect a variety of ailments with varying recovery durations.  For instance,
"stomachache" could include indigestion, food poisoning, influenza, or a hiatal
hernia. "Back problems" could evidence conditions ranging from a muscle strain to
a herniated disc to a fractured vertebra.  Obviously, these varied injuries require
leave periods that differ significantly in length.  The illness notification policy is not
capable of providing supervisors with precise information from which to predict the
length of members' absences with accuracy greater than the estimates provided by
members and their physicians.

unfit."[7]  (Doc. 44-3 ¶ 26.)  PSTA rebuffs this assertion, arguing that numerous PSP

regulations address these concerns without relying on the illness reporting policy.

### a.    Fitness for Duty as a Business Necessity

Clearly, ensuring members' fitness for duty is a business necessity vital to the

operation of PSP.  See Ward, 226 F. App'x at 141 (observing that a fitness-for-duty

examination may qualify a business necessity); see also Thomas v. Corwin, 483 F.3d

516, 527 (8th Cir. 2007) (holding that a police department could require an employee

known to have work-related anxiety to submit to a fitness-for-duty examination

after the employee was absent from work as a result of the anxiety condition).

Miller's motion for summary judgment will be granted to the extent that it argues

that ensuring members' fitness for duty qualifies as a business necessity.

Nevertheless, PSP bears the burden of demonstrating that FR 1-2.11(A)

"serves the asserted business necessity and . . . is no broader or more intrusive than

necessary."  Conroy, 333 F.3d at 98; Fountain v. N.Y. State Dep't of Corr. Servs., No.

99-CV-389, 2005 WL 1502146, at *7 (N.D.N.Y. June 23, 2005) (stating that the

---

[7]Miller does not contend that the illness reporting policy is necessary to detect situations in which members return from sick leave displaying outward signs that they cannot yet perform their full range of duties.  FR 1-2.08 adequately covers such a scenario by permitting a supervisor to refer a member for medical or psychological evaluation if the supervisor has reasonable grounds to believe that the member is unfit for duty.  (See Doc. 42, Ex. A at FR 1-2.08(A), (C)).  According to Miller, FR 1-2.11(A) acts as a complement to FR 1-2.08.  Whereas FR 1-2.08 allows supervisors to investigate ailments that become manifest from a member's conduct, FR 1-2.11(A) provides them with information about a member's latent conditions. (Doc. 46 at 18-19; Doc. 52 at 6-7.)  Miller primarily justifies FR 1-2.11(A) on the grounds that it enables supervisors to detect conditions that have no physical manifestations but might impair a member's abilities.

business necessity defense requires a defendant imposing a medical inquiry to prove that "the information [the defendant] claims it requires must be gathered at the time [the defendant] has chosen in order to serve [the business necessity]").

**b.    Whether FR 1-2.11(A) serves the Fitness-for-Duty Business Necessity**

A procedural and factual review of Conroy refines the contours of a defendant's burden when raising fitness for duty as a business necessity.[8]  In Fountain v. New York Department of Correctional Services, later appealed to the Second Circuit as Conroy, the plaintiff challenged a policy of the New York Department of Correctional Services ("DOCS") that required all sick employees to submit a doctor's certification explaining their condition upon return to work.

_____

[8]The parties have not cited any decision within the Third Circuit that addressed a facial challenge to a generally applicable illness reporting policy under § 12112(d)(4), and the ADA's effect on such a policy appears to be a matter of first impression within the circuit.  The leading case on this issue is Conroy, which has received approval from several federal courts for its discussion of the business necessity defense.  See, e.g., Thomas, 483 F.3d at 527 ("To demonstrate compliance with § 12112(d)(4)(A), the employer bears the burden to show the asserted 'business necessity' is vital to the business and the request for medical examination or inquiry is no broader or more intrusive than necessary."); Mickens v. Polk County Sch. Bd., 430 F. Supp. 2d 1265, 1279 (M.D. Fla. 2006); Transp. Workers Union, 342 F. Supp. 2d at 163 n.10.  Moreover, the Third Circuit and our sister court for the Western District of Pennsylvania have approved Conroy's explication of the business necessity defense in cases addressing employer actions not involving generally applicable illness reporting policies.  See, e.g., Ward, 226 F. App'x at 139-41; Varley v. Highlands Sch. Dist., No. Civ. A. 06-631, 2007 WL 3020449, at *9 (W.D. Pa. Oct. 11, 2007); Strayer v. New Enter. Stone & Lime Co., No. Civ. A. 04-110J, 2006 WL 2773479, at *8 n.4 (W.D. Pa. Sept. 26, 2006).  The court therefore concludes that Conroy correctly delineates the legal principles applicable to the instant matter.  See supra note 4.

190 F. Supp. 2d 335, 337 (N.D.N.Y. 2002).  The district court concluded that the

policy violated the ADA:

> [T]he sick leave policy provides no limitation on the ability of the
> defendants to ask for medical diagnosis.  Employees may take an
> unplanned single day leave of absence for a myriad of reasons, the vast
> majority of which do not suggest an inability to do their job or a threat
> to their work environment.  Examples of such reasons include the
> common cold or care of a sick child.

Id. at 340.  Hence, the court determined that the policy violated the ADA because

DOCS had not predicated it upon "a reasonable expectation that the inquiry . . .

would reveal that the employee was unable to perform work related functions."  Id.

On appeal, the Second Circuit concluded that "the district court's approach

. . . was generally sound."  Conroy, 333 F.3d at 97.  Nevertheless, it vacated the

ruling because the parties had founded their arguments exclusively upon

unsupported hypotheses of the policies' benefits and detriments rather than with

evidence demonstrating that these purported effects were, in fact, realized through

the policy's implementation.  Id.  The court remanded the case, instructing the

parties to present evidence regarding how DOCS applied the policy on a daily basis.

Id. at 99.  Providing guidance for remand, the court concluded that employers

raising a business necessity defense must "show that the asserted 'business

necessity' is vital to the business" and that "the examination or inquiry is no

broader or more intrusive than necessary."  Id. at 97-98.  Further, the employer

must apply the policy to a class of employees whose illnesses may actually impair

their job-related duties:

> In defining a class subject to a general policy, the employer must show
> that it has reasons consistent with business necessity for defining the
> class in the way that it has.  The court should grant some deference to
> the employer in determining how to define a class subject to a general
> policy. . . . If [the employer] can show that, due to its unique staffing
> requirements, it has a reasonable basis for concluding that such
> employees as a group pose a genuine . . . security risk, and that the
> general diagnosis requirement allows [the employer] to decrease that
> risk effectively, it can satisfy the business necessity exception.

Id.

DOCS subsequently amended the policy, removing the illness reporting

requirement for absences of three or fewer days.  Fountain, 2005 WL 1502146, at *2.

On remand, DOCS submitted affidavits of its senior officials, akin to Miller's

affidavit (Doc. 44-3) in the instant case, which described the duties of DOCS

employees, explained the emergency threats (such as unforeseen prison

insurrections) that its employees face on a daily basis, and described the potential

danger posed by employees who report to work unable to discharge their duties

effectively.  Id. at *3 (stating that between 665 and 868 "serious occurrences,"

defined as incidents that "may impact upon or disrupt facility operations," occurred

per year at DOCS correctional facilities between 2000 and 2003).  These officials

attested that DOCS required the diagnosis information to determine whether to

require employees to undergo a health screening exam prior to returning to work.

Id. at *4.  Despite these justifications for the policy, DOCS permitted employees

with common ailments such as influenza to return to work without the required

documentation because such ailments generally had no effect on their ability to

discharge their employment duties.  Id.  The court concluded that the policy failed

19

to qualify under the business necessity defense because DOCS's disparate application of the policy indicated that it was not reasonably related to the asserted business necessity of ensuring employees' fitness for duty.  The court further held that DOCS's illness reporting policy was overbroad because it was not tailored to reflect the job-related duties of employees:

> DOCS's 30,000 corrections officers are engaged in a multitude of tasks which involve a broad range of physical and mental requirements in the context of different types of safety and security risks.  It is not reasonable to lump them all together.  The diagnosis inquiry is only justified by DOCS's need for *employee fitness as required according to the particular duties that an employee must perform*.  It is recognized that categorizing each employee by specific tasks for purposes of requiring medical documentation after absences of different lengths presents an administrative burden.  However, *the current policy lumping all corrections officers together cannot be logically related to the need for a general diagnosis* . . . .  The class as defined does not reflect any effort to narrowly draw a class.

Id. at *10 (emphases added).  The district court concluded that the modified reporting policy continued to violate the ADA because DOCS failed to establish that the reporting requirement furthered its ability to determine whether ill employees were fit to return to their particular employment duties.

The appeal and remand of Conroy and Fountain sets forth the parameters of the business necessity defense when applied to employers such as DOCS and PSP, which serve law enforcement and public safety functions and whose employees must be prepared to respond definitively to unexpected emergencies.  First, the employer must demonstrate that the medical inquiry at issue is vital to the employers' business and is narrowly formulated to prevent unnecessary intrusion

into employees' medical information.  Conroy, 333 F.3d at 97; see also Ward, 226 F.

App'x at 140.  The ADA forbids overbroad inquiries or those supported by mere

convenience.  Conroy, 333 F.3d at 97  Second, the employer must show that the

medical inquiry serves the asserted business necessity *when* the employer chooses

to make the inquiry.  Fountain, 2005 WL 1502146, at *7.  An employer may

implement a broad inquiry after several weeks' leave if the length of absence gives

the employer a reasonable basis to question the employee's ability to perform his or

her job duties.  A broad inquiry, however, is inappropriate at the outset of illness

when the employer has little reason to doubt the employee's fitness.  Id.  Finally, the

employer must demonstrate that it has applied the inquiry to a class of employees

whose job duties could be impaired by the illnesses it requires employees to report.

Conroy, 333 F.3d at 101.

Turning to the instant matter, PSP's illness reporting policy fails to comport

with the principles distilled from Conroy for several reasons.  First, Miller primarily

justifies the policy because it allegedly enables PSP supervisors to detect latent

injuries that could impair members' job performance.  However, PSP does not

inquire about such conditions among members who do not request sick leave, and

Miller has not established a reasonable basis for his belief that all members who use

sick leave pose such risks.  Second, PSP can adequately assess its members' fitness

for duty through many regulations whose legality PSTA does not dispute.  Third,

the policy is not narrowly tailored to the business necessity because it imposes

reporting requirements upon many members who are fit for duty while failing to

21

impose similar requirements on many who are not.  Fourth, PSP has not restricted the illness reporting policy to a class of members whose job duties could be impaired by the conditions subject to inquiry.  Finally, the invalidity of FR 1-2.11(A) is bolstered by its appearance as an inappropriate absenteeism control policy.

i. **FR 1-2.11(A) Is Inconsistent with Miller's Asserted Business Necessity of Ensuring Members' Fitness for Duty**

Miller asserts that FR 1-2.11(A)'s inquiry regarding "the nature of an illness or injury is needed to prevent a trooper from returning to work to perform duties for which he or she is not yet fit." (Doc. 46 at 17.)  He alleges that a host of common ailments, such as influenza, the common cold, and backache, may interfere with a member's duties.  (See Doc. 44-3 ¶ 25.)  Supervisors are often unable to discern these ailments immediately, and the illness notification policy provides supervisors with information from which to evaluate members' abilities.  FR 1-2.11(A), however, falls short of this business necessity because the policy operates based upon members' *use of sick leave* rather than upon the member's *medical condition or employment duties.*

PSP imposes reporting obligations solely upon members who use sick leave. A member who suffers injury or illness need not report the condition provided that

the member avoids a sick leave request.[9]  Under these regulations, two members could be afflicted with an identical condition, such as stomachache, a cold, or a muscle strain, that produces no physical manifestations alerting police supervisors of the nature of the condition.  If one of the members requested sick leave and the other did not (for example, because the member's condition occurred on a weekend or holiday) only the former member's illness would be subject to PSP's reporting requirement.  PSP has not explained why the former member's illness may render the member unfit for duty while the latter's condition passes unquestioned.

The disparate treatment of these two identical members reveals that the inquiry mandated by FR 1-2.11(A) is not vital to PSP's business.  If a stomachache, cold, bout of flu, or other conditions that lack physical manifestations posed a threat to members' fitness for duty, PSP would inquire about *all* such conditions regardless of whether ailing members used sick leave.  PSP's failure to do so indicates that illnesses and injuries without accompanying physical symptoms do not adversely affect members' performance to a degree that warrants a medical inquiry by PSP.  Therefore, FR 1-2.11(A) is broader than necessary because it imposes illness reporting requirements upon members whose fitness for duty PSP does not seriously question.  Miller has failed to explain this overbreadth or to show

---

[9]PSP regulations allow supervisors to require medical evaluations of members who sustain off-duty injuries; however, the supervisor must have reasonable grounds to mandate an evaluation.  (Doc. 42, Ex. A at FR 1-2.08(A)).  The parties have cited no PSP regulation that imposes a general reporting obligation on members who become ill or suffer minor injuries but do not take sick leave.

why PSP cannot limit FR 1-2.11(A) to those conditions that it reasonably believes may impair a member's job performance.

The timing of the illness reporting requirement and the information it requests likewise confirm that FR 1-2.11(A) is not vital to PSP's business necessity. The regulation imposes a reporting obligation at the outset of members' illnesses, when members and their treating physicians may be ill-equipped to forecast the severity or nature of ailments. The information subject to disclosure cannot fully represent the extent of an illness's effect on a member. See supra Part III.B.1.b at 13 & 15 n.7. This early, indefinite inquiry is unlikely to yield reliable information from which supervisors can accurately evaluate the effects of an illness or injury on members' abilities. PSP could perform a more thorough, accurate assessment of members' conditions at another point in time, such as upon return to work, when members and supervisors could retrospectively evaluate the extent to which prior health conditions continue to cause job impairment.[10] Hence, Miller has not shown that PSP requires information about members' conditions to ascertain their fitness for duty at the point in time when PSP has chosen to place the inquiry. See Fountain, 2005 WL 1502146, at *7.

In light of the incongruence between the illness reporting policy and PSP's articulated business necessity, the court concludes that PSP has relied upon sick

---

[10]The court expresses no opinion regarding whether PSP could apply FR 1-2.11(A) to all members upon return from sick leave without violating the ADA. Such an inquiry would be appropriate only if PSP demonstrated that it satisfied the business necessity standard set forth in Conroy, 333 F.3d at 97-98.

24

leave use as a convenient proxy for the identification of conditions that might, but that are not certain to, affect a member's fitness for duty.  PSP has failed to craft the policy in a manner that identifies a limited class of illnesses and a limited class of members that threaten to impair PSP's law enforcement functions.  In sum, FR 1-2.11(A) is neither vital to the business of PSP nor narrowly tailored to serve the avowed business necessity.  It is merely an expedient way to screen members' conditions and violates § 12112(d)(4) as a result.[11]  See Conroy, 333 F.3d at 97 (quoting Cripe, 261 F.3d at 890) ("[T]he business necessity standard is quite high, and is not [to be] confused with mere expedience." (second alteration in original)); El, 479 F.3d at 242 (holding that regulations must accurately address the business necessities at which they are directed and stating that overbroad or generalized attempts fail to comply with this standard).

---

[11]This holding prevents PSP from imposing a reporting requirement upon medical conditions that have no effect on a member's fitness for duty.  It does not prohibit PSP from soliciting information about a discrete class of conditions that PSP believes may impair a member's abilities.  PSP may also impose a general reporting requirement on lengthier absences provided that it demonstrates that such absences affect fitness for duty.  See Conroy, 333 F.3d at 101 (stating that the business necessity defense requires the defendant to establish a "reasonable basis" for concluding that members are unfit for duty in the particular circumstances to which the employer applies a medical inquiry and the inquiry enables the employer "to reduce that risk effectively"); Law v. Garden State Tanning, 159 F. Supp. 2d 787, 794 (E.D. Pa. 2001) (holding that business necessity requires the employer to demonstrate "sufficient evidence for a reasonable person to doubt whether an employee is capable of performing the job, and the examination must be limited to determining an employee's ability to perform essential job functions").

### ii.    Other Regulations of Unchallenged Validity Adequately Address the Asserted Business Necessity

PSP's ability to assess members' fitness for duty through other regulations of unchallenged validity confirms that FR 1-2.11(A) extends beyond the purview of the asserted business necessity.  PSP regulations require that members reporting for duty be "physically and mentally fit, properly attired, and *ready to assume on-duty status*."  (Doc. 42, Ex. A at FR 1-2.10(A) (emphasis added)).  Supervisors may refer members for a medical or psychological examination if members cannot satisfactorily discharge their duties.  (See id. at FR 1-2.08(A)-(C)).  They may also place ailing or injured members on restricted-duty status and require members to receive medical clearance before returning to regular duty.  (See id. FR 1-2.08(D)).  Members who use three or more consecutive days of sick leave must provide a physician's certificate attesting to their inability to work during the leave period.  (See Doc. 42, Ex. B at AR 4-5.07(C)(6)).

Miller contends that these regulations cannot replace FR 1-2.11(A) because they do not enable supervisors to detect members' latent conditions.  He argues that without FR 1-2.11(A), a member could report to work with a "condition not readily discernible and, consequently, jeopardiz[e] the safety of the trooper, other troopers or the public.  Once the trooper has acted in such a way as to provide reasonable grounds for the exam, damage may already have been done."  (Doc. 52 at 6-7.)

This asserted justification does not salvage FR 1-2.11(A) because the regulation fails to accomplish PSP's objective of ensuring member fitness. The illness reporting policy requires "only a general statement of the injury/illness," such as "flu, back problems, stomachache, or cold." (Doc. 44-3 ¶ 25.) These descriptions can reflect a host of medical conditions. PSP supervisors cannot fully understand the nature of members' conditions and their lasting effects without more specific medical information. To assess fitness accurately, supervisors would need to possess thorough information about injuries or ailments and observe how those conditions affected members *in the practice of their duties*. Only after possessing such information could supervisors make an informed, reasoned judgment about members' abilities. PSP regulations allow supervisors to gain this information by referring members for medical or psychological examinations based upon evaluation of their performance. (See Doc. 42, Ex. A at FR 1-2.08(C). Hence, FR 1-2.11(A) is not vital to PSP's asserted business necessity because it does not provide supervisors with sufficient information to adjudge fitness for duty.

Regulations such as FR 1-2.08 and AR 4-5.07 enable supervisors to assess members' fitness without imposing a reporting requirement. Members need not report injuries or ailments unless they use sick leave, yet many conditions identically affect both absent members and those who report for duty. (See Doc. 44-3 ¶¶ 25-26.) PSP's failure to impose illness reporting obligations on members who report as scheduled indicates other regulations are sufficient to screen these members for latent conditions that may affect their performance. PSP has not

27

demonstrated why these same regulations cannot screen absent members for

identical conditions with similar effectiveness.  Hence, other regulations accomplish

this task, and FR 1-2.11(A) is more intrusive than necessary to manage PSP's

concerns.

> ### iii.   FR 1-2.11(A) Is Both Overbroad and Underinclusive with Respect to PSP's Asserted Business Necessity

FR 1-2.11(A) is not narrowly tailored to PSP's business necessity because the

inquiry it imposes is simultaneously overbroad and underinclusive.  FR 1-2.11(A)

requires many members who are fit for duty to report conditions that do not affect

their employment, rendering it overbroad.  The policy mandates that members

report minor medical conditions, including a cold, seasonal allergies, or other minor

ailments, that "[c]ommon sense dictates . . . [are responsible for] a large portion of

sick leave."  Fountain, 2005 WL 1502146, at *7.  These conditions may require a

member to request a day away from work but pose no threat to a member's fitness

for duty upon return.  The illness notification policy contains no exemption for sick

leave used to address these conditions.  Hence, with regard to many common

ailments, PSP inquires about information that it has no reasonable basis to believe

will affect member fitness.  The ADA does not contemplate this overbroad inquiry

into issues having only tangential significance to PSP's asserted business necessity.

The policy is simultaneously underinclusive because it fails to detect

performance-inhibiting ailments of members who do not request time off work.

Members may have various conditions, such as heart trouble, seizures, or

psychological conditions, that they successfully manage through off-duty medical treatment, preventing them from reporting the conditions to PSP.  However, Miller asserts that such conditions pose an immediate threat to members' employment duties.  (Doc. 44-3 ¶ 26.)  The ability of members to elude PSP's reporting obligations renders the illness reporting policy underinclusive because it fails to detect many conditions that impede successful job performance.[12]  Hence, FR 1-2.11(A) is overbroad and underinclusive in the reporting obligations it imposes.  The disharmony between PSP's fitness concerns and the information it requests indicates that the policy is not narrowly tailored to PSP's asserted business necessity of ensuring members' fitness for duty and is improper under the ADA.

---

[12]Martin v. Kansas, 190 F.3d 1120 (10th Cir. 1999), overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356 (2001), countenances inquiry regarding employees' latent conditions that may affect their performance of employment duties.  In Martin, the plaintiff corrections officer challenged a disability disclosure questionnaire circulated annually by prison officials.  The form instructed employees to indicate whether they had a disability in one of six areas. Id. at 1124.  Supervisors relied upon employees' responses when assigning corrections officers to security posts, many of which required corrections officers to respond to unforeseen prison emergencies.  Id. at 1132.  The United States Court of Appeals for the Tenth Circuit upheld the inquiry because it was "intended to gather information to be used in setting post assignments and establishing reasonable accommodations" to ensure that security positions were staffed with officers capable of responding to exigent circumstances.  Id. at 1134.  Such an inquiry may present a viable method of collecting information that PSP requires to monitor member fitness; however, the court expresses no opinion regarding whether a particular inquiry would qualify for the business necessity defense under the ADA.

### iv.     PSP's General Reporting Policy Does Not Distinguish among Members' Responsibilities

The general application of PSP's policy to all members regardless of their employment duties provides further evidence of its overbreadth. An employer that applies an illness reporting policy to all employees must demonstrate that it has "reasons consistent with business necessity for defining the class [of employees subject to the regulation] in the way that it has." Conroy, 333 F.3d at 101. The employer must link the policy to the "particular duties that the employee[s subject to it] must perform." Fountain, 2005 WL 1502146, at *10.

Transportation Workers Union, Local 100 v. New York City Transit Authority illustrates the correlation of reporting requirements to employee responsibilities. In that case, the Transit Authority required all employees to state "the nature of [the] disability" that caused the employee's absence when returning from sick leave. Transp. Workers Union, 341 F. Supp. 2d at 438. The employees' union challenged the policy, and the Authority asserted that it served the business necessity of, inter alia, ensuring workplace safety. Id. at 439. The court upheld the policy insofar as it applied to bus drivers but invalidated it with respect to other employees. Id. at 451. Bus drivers' primary duties included the operation of transportation vehicles, a task which even minor illnesses could impair. Id. The duties of other employees, however, were not affected by many common illnesses. The court approved the inquiry as applied to bus drivers because it directly related

to their particularized duties, performance of which may have suffered from even relatively minor illnesses. Id. at 451 n.90.

In the instant matter, PSP applies the policy to all members without regard to the particular duties that they perform. In fact, members, who may be called to duty at any time, fill a variety of police roles. (Doc. 44-3 ¶ 19.) Some members participate in elite squads charged with specialized duties or emergency operations, such as PSP's pilot contingent and Special Emergency Response Team. (Id.) Others receive more routine duty assignments, including highway patrol, performance of standard traffic stops, and providing police protection for municipalities without full-time police departments. (Id. ¶ 18.) Presumably, many members also perform a variety of administrative and community outreach tasks.

Despite this wide range of assignments, all members are subject to a single, monolithic reporting policy. Miller has not identified which duties ailing members might be unable to perform, nor has he discussed how illness affects the various functions that its members serve. Rather, PSP has assumed that the same fitness for duty concerns apply mechanically to all members regardless of their job description. An illness reporting policy cannot be applied in so prophylactic a fashion. For example, a member who has consumed cold medicine may be unfit for duty on PSP's pilot squad, whereas the same medication would likely not impair a member assigned to perform ministerial tasks or investigative research. PSP's failure to apply FR 1-2.11(A) in a manner cognizant of members' varying job

31

responsibilities renders it illogical and broader than necessary to satisfy the fitness-for-duty business necessity.

### v.   PSP's Policy Is an Attempt to Control Absenteeism in a Manner Disapproved by *Conroy*

The structure of FR 1-2.11(A) reflects that of an attendance control regulation,[13] and its status as such undermines PSP's fitness-for-duty business necessity for several reasons.  First, the regulation applies solely to off-duty injuries that require a member to be absent from work.  It does not detect off-duty injuries that impair a member's fitness but that do not require the member to request leave.  See supra Part III.B.2.i.  The plain language of the regulation exclusively addresses member absence.  It does not restrict members from returning to duty prior to full recuperation, nor does it require members to self-report conditions that affect their employment performance.  Nothing in the regulation discusses members' discharge of their duties.  Were FR 1-2.11(A) designed as a fitness-for-duty regulation, it would presumably address *all* injuries that could affect a member's performance and define the duties that members must be capable of performing prior to return.  Rather, the regulation's exclusive reliance on attendance reflects its primary purpose:  to control absenteeism and scheduling.

---

[13]PSP has not proffered attendance control as a business necessity supporting FR 1-2.11(A), and the court expresses no opinion regarding whether curbing attendance abuse qualifies as a business necessity or whether PSP could establish that FR 1-2.11(A) furthered such a business necessity if it were found to exist.

Second, FR 1-2.11(A) appears alongside other regulations that govern member attendance.  FR 1-2.11(C) prohibits fictitious illness reports and prohibits members from feigning illness or from otherwise requesting sick leave in a deceptive manner.  FR 1-2.11(B) and (D) pertain to on-duty injuries and contagious diseases that may require a member to use sick leave.  Read in conjunction with these provisions, FR 1-2.11(A) is primarily designed to encourage member attendance and to ensure that only genuinely ill or injured members request sick leave.  Were it formulated as a fitness-for-duty regulation, it would presumably appear alongside other PSP regulations that expressly govern member fitness.  For example, FR 1-2.10, entitled "Duty Requirements," directs members to report for their assigned shifts prepared to execute the full range of their official duties. FR 1-2.08 authorizes medical examinations for members suffering from a condition that could impair job performance.  If fitness for duty were the primary concern of FR 1-2.11(A), it would presumably appear with these regulations rather than with the attendance provisions of FR 1-2.11.

Finally, <u>Conroy</u> cautioned that, while generally applicable illness reporting policies do not necessarily violate the ADA, "the examination of whether a policy actually contributes to the business necessity is vital."  333 F.3d at 100.  In the instant matter, PSP regulations impose overbroad reporting requirements on members who use sick leave and fail to detect latent conditions, such as heart disease or psychological disorders, of many who do not.  These latent conditions are precisely identical to those upon which PSP relies to support the medical inquiry

when members return from absences.  The regulations's failure to detect these conditions, when coupled with the imposition of this inquiry upon many absent members who PSP does not suspect of such conditions, confirms that FR 1-2.11(A) is not narrowly tailored to contribute to the asserted business necessity.

There may be a general inquiry that PSP could implement across its complement to identify latent conditions that inhibit fitness for duty.  However, without tying the inquiry to medical conditions and member duties, FR 1-2.11(A) becomes little more than a convenient proxy by which PSP screens member fitness. As such, it is not "vital to [PSP's] business," nor is it necessary to ensure members' fitness for duty.  Id. at 97; see also Ward, 226 F. App'x at 140.

## IV.   <u>Conclusion</u>

While a general medical reporting requirement might pass muster under the ADA if the employer demonstrates that it is a vital component of the employer's operation, FR 1-2.11(A) falls short of this threshold.  PSP's motion for summary judgment will be granted to the extent that it asserts that arranging adequate staff coverage and ensuring members' fitness for duty qualify as business necessities. PSTA's motion will be denied insofar as it contests this point.

However, PSP has failed to demonstrate that FR 1-2.11(A) is both vital to these business necessities and narrowly tailored to further them.  PSTA's motion

34

for summary judgment seeking declaratory and injunctive relief[14] will therefore be

granted, and PSP's motion for summary judgment will be denied.

An appropriate order follows.


                                          S/ Christopher C. Conner
                                         CHRISTOPHER C. CONNER
                                         United States District Judge


Dated:        September 30, 2008

---

[14]The injunctive relief sought by PSTA will take effect thirty days following
the date hereof.  This period will grant PSP time within which to promulgate a
regulation replacing FR 1-2.11(A) that is consistent with the business necessity
defense as articulated in <u>Conroy</u> and <u>Ward</u>.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNSYLVANIA STATE** | : | **CIVIL ACTION NO. 1:06-CV-1079** |
| **TROOPERS ASSOCIATION and** | : | |
| **BRUCE A. EDWARDS,** | : | **(Judge Conner)** |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONEL JEFFREY B. MILLER,** | : | |
| **individually and in his official capacity** | : | |
| **as Commissioner of the** | : | |
| **Pennsylvania State Police,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 30th day of September, 2008, upon consideration of the

cross-motions for summary judgment (Docs. 40, 44), and for the reasons set forth in

the accompanying memorandum, it is hereby ORDERED that:

1.    The motion for summary judgment (Doc. 40) of plaintiffs Pennsylvania
      State Troopers Association and Bruce A. Edwards is GRANTED in
      part and DENIED in part as follows:

   a.    The motion is GRANTED to the extent that it requests
         declaratory and injunctive relief against further enforcement of
         the illness reporting clause of Pennsylvania State Police Field
         Regulation 1-2.11(A).

   b.    The motion is otherwise DENIED.

2.    The motion for summary judgment (Doc. 44) of defendant Colonel
      Jeffrey B. Miller is GRANTED in part and DENIED in part:

   a.    The motion is GRANTED to the extent that it asserts that
         arranging adequate staff coverage and ensuring members'
         fitness for duty qualify as business necessities under § 102(d)(4)

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(d)(4).

  b.  The motion is otherwise DENIED.

3.  Defendant Colonel Jeffery B. Miller shall be enjoined from further enforcement of the illness reporting clause contained in FR 1-2.11(A) under separate order of court.

4.  The Clerk of Court is instructed to enter JUDGMENT in favor of plaintiffs and against defendant on all claims.

5.  The Clerk of Court is instructed to CLOSE this case.


   S/ Christopher C. Conner
   CHRISTOPHER C. CONNER
   United States District Judge